## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | |
|---|---|
| STEPHENE MOORE, on behalf of her minor child, "PM," | |
| Plaintiff, | Case No. 3:22-cv-50354 |
| v. | Honorable Iain D. Johnston |
| OFFICER BRADLEY LAUER, *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Although public school students enjoy "less than the full constitutional liberty protection afforded those persons not in school," they "do not completely surrender their constitutional rights at the schoolhouse gate." *Wallace by Wallace v. Batavia Sch. Dist. 101*, 68 F.3d 1010, 1013 (7th Cir. 1995). Stephene Moore brings this suit on behalf of her minor son, PM. Dkt. 29, at ¶¶ 9–10. PM was a fourteen-year-old freshman at Auburn High School in Rockford, Illinois. *Id.* at ¶¶ 13, 35, 136. It is alleged that, following a classroom dispute, school officials violently restrained PM by blocking his movements, grabbing PM, tackling PM, and ultimately throwing PM to the floor, fracturing his skull and causing lifelong physical and mental repercussions. *See generally*, Dkt. 29.

Before the Court is Ms. Moore's twelve-count first amended complaint. *Id.* She is suing a host of defendants: Rockford, the Board of Education (the "Board"), School Liaison Officer ("SLO") Bradley Lauer, Assistant Principal Scott Dimke, Assistant

1

Principal and/or Dean Amber Lee-Black, Hall Monitor/Security Guard Jessica Badford, President of the Board Jude Makulec, Superintendent Ehren Jarrett, and General Counsel of the School District Lori Hoadley. *Id.* at ¶¶ 12–23.

The Board, Mr. Dimke, Ms. Lee-Black, Ms. Badford, Dr. Jarrett, Ms. Makulec, and Ms. Hoadley (the "School District Defendants") moved to dismiss nine of the twelve counts in the first amended complaint. Dkt. 36. Based on the allegations, which the Court must currently accept as true, their motion is granted in part and denied in part.

## ALLEGATIONS

During Second Period, PM's teacher asked him to remove his "hoodie." *Id.* at ¶ 36. PM refused, and the teacher "ordered him to leave class." *Id.* PM left class, and the school called his grandmother who promptly picked him up from school. *Id.*

The next day, PM again went to Second Period. *Id.* at ¶¶ 37–38. The same teacher began "nitpicking at PM" and "harassing him about where in the classroom he could sit." *Id.* PM again left the classroom and entered the hallway. *Id.* at ¶¶ 38–39.

In the hallway, PM walked past his Second Period classroom where his teacher told PM that he was supposed to be in class. *Id.* at ¶ 39. PM ignored the instruction, and continued walking down the hall. *Id.* The Second Period teacher then "summoned a school official to deal with PM." *Id.*

Enter Mr. Dimke. *Id.* at ¶ 40. Mr. Dimke had, on prior occasions, "pushed," "tackled," and "grabbed" other students by their backpacks or "hoodies." *Id.* at ¶ 131.

Allegedly true to form, Mr. Dimke "spotted" PM, "approached" PM, who is African American, and "started a prolonged and aggressive interaction with him." *Id.* at ¶¶ 11, 40. Mr. Dimke, "a large man relative to PM," blocked PM's path forward, and "physically grabbed hold of PM's backpack while it was on his back." *Id.* at ¶ 41. "PM did not actively resist." *Id.* at ¶ 42.

Sensing something awry in her domain, Ms. Badford "walked up" to PM and Mr. Dimke and "listened to their conversation, and began talking to PM as well." *Id.* at ¶ 43.

Presumably free from Mr. Dimke's grip, PM continued walking, and Mr. Dimke and Ms. Badford "walked calmly behind PM, following him." *Id.* at ¶ 44. But as PM approached the main school office, Mr. Dimke again "caught up to PM" and "physically blocked his path forward." *Id.* at ¶ 47.

Ms. Lee-Black then arrived on the scene in the main school office hallway. *Id.* at ¶ 48. There, she "observed and overheard" Mr. Dimke's "interactions and communications with PM." *Id.*

PM turned around, and "walked in the opposite direction" from Mr. Dimke, who had been blocking his path forward. *Id.* at ¶¶ 47, 49. Mr. Dimke, once again, "physically grabbed hold of PM's backpack" to "stop and restrain his forward motion." *Id.* ¶ 50. PM, again, did not resist the restraint. *Id.* at ¶ 51. Mr. Dimke let PM loose, and PM continued walking. *Id.* Mr. Dimke then "grabbed PM's arm with one hand and constantly held onto PM as he walked." *Id.* at ¶ 52.

3

They passed Ms. Lee-Black in tandem, and Ms. Lee-Black "did not say or do anything to" Mr. Dimke to "intervene or suggest[] another course of action by the school." *Id.* at ¶ 54.

Things then turned more physical. *See id.* at ¶ 55. Mr. Dimke "grabbed PM, wrapped both of his arms around PM's body from behind, and physically carried or dragged PM into the main school office." *Id.* When they entered the office, Mr. Dimke blocked PM's retreat and tried to talk to PM. *Id.* at ¶ 57. The main school office was a new environment for PM. *Id.* at ¶ 56. PM had never been in there before. *Id.* PM viewed the main school office as a "small, secluded room" that was an "isolated space." *Id.* PM grew scared. *Id.* And when PM tried to leave, Mr. Dimke "moved to block him and physically pushed him back into the office." *Id.* at ¶ 58.

Mr. Dimke or Ms. Lee-Black called for one of Auburn's two SLOs to help. *Id.* at ¶ 59. SLO Lauer answered the call and headed their way. *Id.* at ¶ 60. All the while, Mr. Dimke was pushing PM "backwards and deeper" into the main school office. *Id.* at ¶ 61. Mr. Dimke then "attempted to tackle or physically jump onto PM's body with the full weight of his body while at the same time pushing him through a closed door inside the office." *Id.* at ¶ 63. The attempt resulted in both Mr. Dimke and PM on the floor, with Mr. Dimke on top of PM, and PM "restrained." *Id.* at ¶ 64. Though close enough to observe and hear Mr. Dimke and PM's interactions, neither Ms. Lee-Black nor Ms. Badford "said or did anything at the time" to deescalate the situation. *Id.* at ¶ 66.

SLO Lauer then entered the cacophony. *Id.* at ¶ 67. After entering the office, he "immediately and physically took over the situation" without speaking to anyone. *Id.* SLO Lauer "did not know what was happening and whether PM posed any danger" to Mr. Dimke. *Id.* at ¶ 68.

Nevertheless, SLO Lauer jumped into action and grabbed both of PM's arms "from behind his body" to "pull him out into the hallway." *Id.* at ¶ 72. PM did not "fight or resist" SLO Lauer, who was, at least, one-foot and seventy pounds larger. *Id.* at ¶¶ 73, 74.

Then, without any warning whatsoever, SLO Lauer, who was still behind PM, "locked his arms into PM's arms at the elbows, lifted PM up off of the floor and over his head, and slammed PM down to the hard, tile floor, head-first." *Id.* at ¶ 75.

Unable to break the fall with his arms, PM's "head and body hit the floor and bore the brunt of the impact." *Id.* at ¶¶ 76–77. PM's skull fractured, and he was knocked unconscious on impact. *Id.* at ¶¶ 76, 78. PM laid limp on the floor– motionless–for several minutes. *Id.* at ¶ 78. While PM was unconscious, SLO Lauer handcuffed PM and searched PM's pockets, revealing nothing newsworthy. *Id.* at ¶¶ 80–81.

Paramedics arrived on the scene, and the paramedics and SLO Lauer put PM in a wheelchair. *Id.* at ¶ 82. SLO Lauer allegedly lied to the paramedics and told them that PM had fallen. *Id.* at ¶ 87. They wheeled him to a stretcher near the main entrance of the office where they released PM to his grandmother. *Id.* at ¶¶ 82, 84. SLO Lauer and school officials told Ms. Moore that SLO Lauer and PM had been

"scuffling" and that PM "slipped," "fell," and "hit his head." *Id.* at ¶ 86 (internal quotations omitted). She immediately took PM to the emergency room. *Id.* at ¶ 84.

Within one month of the incident, SLO Lauer either resigned his position at Auburn High School or was involuntarily transferred. *Id.* at ¶ 95. Nevertheless, Ms. Moore alleges that the Rockford Police Department and Rockford neither "conducted an immediate investigation of the incident," nor "opened an internal affairs investigation after the incident." *Id.* at ¶ 96. Ms. Moore believes that the Rockford Police Department has yet to discipline Mr. Lauer, and that the Rockford Police Department and Rockford have declined to publicly comment on the matter, acknowledge the incident, or hold anyone accountable for SLO Lauer's conduct. *Id.* at ¶ 98.

After the incident unfolded, "school officials" told PM's family that "no further disciplinary action was needed or would be taken with respect to PM." *Id.* at ¶ 112. They also stated that there would be no juvenile criminal charges pressed against PM. *Id.* at ¶¶ 113, 115. Despite their assurances, and after PM's family retained counsel and asked the Board and Rockford Police Department to retain evidence, PM's family received a letter from a juvenile probation officer informing them that PM had been "charged with an alleged offense." *Id.* at ¶ 116–17 (internal quotations omitted). The letter summoned PM's family to a meeting and threatened PM with prosecution if they did not attend. *Id.* According to Ms. Moore, sometime after January 1, 2022, the charge was terminated in PM's favor. *Id.* at ¶ 118.

Ms. Moore alleges that the Board and Rockford Police Department pursued the criminal charge to "punish PM and his family for taking legal action and to threaten PM with a criminal record in order to intimidate and chill them from exercising PM's civil rights by filing a lawsuit." *Id.* at ¶ 119. To retaliate against PM and his family, Ms. Makulec, Dr. Jarrett, and Ms. Lori Hoadley also repeatedly refused PM's request to transfer high schools within the School District against the advice of outside counsel. *Id.* at ¶¶ 120–21.

SLO Lauer's actions allegedly wreaked havoc on PM's physical and mental health. *See id.* at ¶¶ 99–111. Beyond breaking his skull, PM suffered a traumatic-brain-injury ("TBI"). *Id.* at ¶ 101. His jaw "caused him so much pain that he had to eat soft foods for several weeks, and for weeks his ribs hurt whenever he breathed" or stood up. *Id.* He was unable to walk when he returned home from the hospital, his "hands were folded inward" and "he appeared pigeon-toed." *Id.* at ¶ 102. For weeks after accruing the injuries, PM suffered "severe headaches, rarely slept, and was frequently throwing up." *Id.* at ¶ 103. PM's TBI caused permanent brain damage, exacerbating PM's ADHD, limiting PM's ability to speak, changing PM's personality, decreasing PM's social skills, and reducing PM's ability to form memories and exercise fine motor control. *Id.* at ¶¶ 103–05. He has grown "socially withdrawn" and fears school and the "outside world." *Id.* at ¶ 106. He suffers from involuntary flashbacks and seems to be "in his own mental world." *Id.* at ¶¶ 108–09. PM's prognosis is poor, and he "requires high quality, long-term, costly, phycological care and counseling" to cope with his injuries. *Id.* at ¶¶ 104, 111.

## PROCEDURAL POSTURE

Ms. Moore's first amended complaint includes twelve counts. *See* Dkt. 29. Count I is a 42 U.S.C. 1983 unconstitutional seizure claim against SLO Lauer. *Id.* at ¶¶ 142–46. Count II is a § 1983 excessive force claim against SLO Lauer. *Id.* at ¶¶ 147–51. Count III is a § 1983 "substantive constitutional rights/excessive force/excessive corporeal punishment" claim against Mr. Dimke. *Id.* at ¶¶ 152–157. Count IV is a § 1983 "substantive constitutional rights – conduct that shocks the conscience" claim brought against Mr. Dimke and SLO Lauer. *Id.* at ¶¶ 158–161. Count V is a § 1983 failure to intervene claim against Mr. Dimke, Ms. Lee-Black, and Ms. Badford. *Id.* at ¶¶ 162–67. Count VI is a § 1983 *Monell* claim against Rockford and the Board. *Id.* at ¶¶ 168–96. Count VII is § 1983 Equal Protections Clause claim against the Board, Ms. Makulec, Dr. Jarrett, and Ms. Hoadley. *Id.* at ¶¶ 197–210. Count VIII is a § 1983 retaliatory prosecution claim against SLO Lauer, Rockford, and the Board. *Id.* at ¶¶ 211–18. Count IX is a malicious prosecution claim under Illinois state law against SLO Lauer, Rockford, and the Board. *Id.* at ¶¶ 219–224. Count X is a § 1983 First Amendment retaliation claim against the Board, Ms. Makulec, Dr. Jarrett, and Ms. Hoadley. *Id.* at ¶¶ 225–232. Count XI is a respondeat superior claim against Rockford and the Board, and Count XII is a claim for indemnification against Rockford and the Board. *Id.* at ¶¶ 233–41.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 8 requires only that a plaintiff's complaint contain a short and plain statement establishing the basis for the claim and the

Court's jurisdiction, as well as prayer for the relief sought. Fed. R. Civ. P. 8(a). According to the Supreme Court, this means that the complaint's factual assertions, rather than any legal conclusions, must raise the plausible inference that the defendant is liable for the misconduct alleged. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Reasonable inferences are drawn in favor of the plaintiff. *St. John v. Cach, LLC*, 822 F.3d 388, 389 (7th Cir. 2016). The defendant, as the moving party, bears the burden of establishing that the complaint's allegations, taken as true, are insufficient. *Marcure v. Lynn*, 992 F.3d 625, 631 (7th Cir. 2021).

## ANALYSIS

Before the Court turns to the claims themselves, it must untangle whether the individual defendants are being sued in their personal or official capacities. Of course, such a distinction has significant ramifications, a few of which are discussed below.

First, in the § 1983 context, "[m]ore is required in an official-capacity action." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Because a lawsuit against an individual in his official capacity is a suit against the official's office, the office itself must be the "moving force" behind the constitutional deprivation. *Id.* (cleaned up). As discussed further below, this necessarily requires the plaintiff to satisfy the more demanding "policy or custom" standards that *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), and its progeny require. An action against an individual in his personal capacity is much simpler: "it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right."

*Graham*, 473 U.S. at 166. *Monell* is "always inapplicable" to personal-capacity suits. *Wilson v. Civil Town of Clayton, Ind.*, 839 F.2d 375, 382 (7th Cir. 1988).

Second, a § 1983 lawsuit against an individual defendant in his official capacity "must look to the government entity itself" to collect an award of damages. *Graham*, 473 U.S. at 166. Punitive damages are unavailable in such actions. *Id.* at 167 n. 13 (citing *Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1985)). A § 1983 lawsuit against an individual in his personal capacity may "hold the official personally liable by collecting damages from the official's personal assets." *Smith v. Doherty*, 767 F. Supp. 925, 927 (N.D. Ill. 1991) (citing *Henry v. Farmer City State Bank*, 808 F.2d 1228, 1237 (7th Cir.1986)). A plaintiff can collect punitive damages in such suits. *Graham*, 473 U.S. at 167 n. 13.

Third, with respect to defenses to liability, the "only immunities that can be claimed in an official-capacity action are forms of sovereign immunity" that the entity may possess, "such as the Eleventh Amendment." *Graham*, 473 U.S. at 166–67 (internal citations omitted). An individual defendant sued in his personal capacity, however, may be able to assert absolute or qualified immunity. *Id.*

The complaint specifies that Ms. Makulec, Dr. Jarrett, and Ms. Hoadley are sued in their official capacities. *See* Dkt. 29. And while Ms. Moore chalks this up to a scriveners' error and projects her desire to amend this designation, she may not do so in a response to a motion to dismiss. Dkt. 49, at 26–28; *Thomason v. Nachtrieb*, 888 F.2d 1202, 1205 (7th Cir. 1989) ("[I]t is a basic principle that the complaint may not be amended by the briefs in opposition to a motion to dismiss. . . .").

10

The complaint does not specify whether SLO Lauer, Mr. Dimke, Ms. Lee-Black, and Ms. Badford are being sued in their official or personal capacities. But the fact that Ms. Moore seeks punitive damages is a "sure tipoff that the suit *must* be an individual capacity and not an official capacity action." *Viero v. Bufano*, 901 F. Supp. 1387, 1395 n. 10 (N.D. Ill. 1995). Thus, the claims against SLO Lauer, Mr. Dimke, Ms. Lee-Black, and Ms. Badford will be considered as having been brought against them in their personal capacities.

With those distinctions in mind, the Court takes in turn each of the School District Defendants' arguments for dismissal.

I.     Count III may proceed on an excessive force/corporeal punishment theory.

The School District Defendants move to dismiss Count III to the extent it is based on a Fourteenth Amendment due process violation, as well as to the extent it is based on the Fourth Amendment excessive force/corporeal punishment theory. Dkt. 36-1, at 9–12. In response, Ms. Moore only substantively defends Count III as it relates to the Fourth Amendment. Dkt. 49, at 5–7. Ms. Moore also concedes that Count III "is *not* predicated on a Fourteenth Amendment due process violation." *Id.* at 7. Therefore, the due process theory of liability is dismissed with prejudice. *See Boogaard v. Nat'l Hockey League*, 891 F.3d 289, 295 (7th Cir. 2018).

The Fourth Amendment, as applied to the states by the Fourteenth Amendment, protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend.

IV. The Fourth Amendment applies to searches and seizures conducted by public school officials. *New Jersey v. T.L.O.*, 496 U.S. 325, 333 (1985).

To state a claim for an unreasonable seizure, a plaintiff must allege both a seizure, and that the seizure was unreasonable. *Brown v. Chi.*, 594 F. Supp. 3d 1021, 1031 (N.D. Ill. 2022). "[A] teacher or administrator who seizes a student does so in violation of the Fourth Amendment only when the restriction of liberty is unreasonable under the circumstances then existing and apparent." *Wallace by Wallace*, 68 F.3d at 1014. Reasonableness is a "fact intensive argument" that is generally "inappropriate on a motion to dismiss." *Grafton v. Fobelk*, No. 18-CV-6099, 2020 U.S. Dist. LEXIS 237431, at *10–11 (N.D. Ill Dec. 17, 2020).

Ms. Moore alleges that Mr. Dimke, "a large man relative to PM," blocked PM's path and grabbed him by his backpack on multiple occasions. Dkt. 29, at ¶¶ 41, 50, 57. PM did not resist. *Id.* at ¶¶ 42, 51. Mr. Dimke progressed his restraint, wrapping both arms around PM's body and physically bringing him into the main school office. *Id.* at ¶ 55. There, he continued to block PM's path to retreat and repeatedly pushed PM further and further into the office. *Id.* at ¶¶ 56, 57, 58. Mr. Dimke eventually "attempted to tackle or physically jump onto PM's body with the full weight of his body," resulting in Mr. Dimke ending up on top of PM with PM restrained. *Id.* at ¶ 64. Such allegations are sufficient to state a claim under the Fourth Amendment. *Brown*, 594 F. Supp. 3d at 1033–34.

The School District Defendants press, alternatively, that Mr. Dimke is entitled to qualified immunity. A complaint is "generally not dismissed under Rule 12(b)(6)

on qualified immunity grounds." *Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001). Indeed, "an immunity defense usually depends on the facts of the case." *Id.* At the pleading stage, "the plaintiff is not required initially to plead factual allegations that anticipate and overcome a defense of qualified immunity." *Jacobs v. Chi.*, 215 F.3d 758, 765 n. 3 (7th Cir. 2000). So, "Rule 12(b)(6) is a mismatch for immunity and almost always a bad ground for dismissal." *Alvarado*, 267 F.3d at 652. But sometimes courts are required to grant qualified immunity on Rule 12(b)(6) motions to dismiss. *Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 916 (7th Cir. 2015).

In any event, qualified immunity "shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Green v. Newport*, 868 F.3d 629, 632 (7th Cir. 2017) (cleaned up). To overcome qualified immunity, the plaintiff must "first allege the deprivation of an actual constitutional right, and second, show that the right was clearly established at the time of the alleged violation." *Alvarado*, 267 F.3d at 652. Because the Court has already addressed the first prong, the Court turns to the second.

A right is "clearly established" when the "contours of the right" are "sufficiently clear" such that a "reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S 635, 640 (1987). Prior case law need not be identical to be "sufficiently clear." *Id.* Rather, the plaintiff must show that, "in light of pre-existing law," a reasonable defendant would have known his actions were unlawful. *Id.* "Supreme Court and Seventh Circuit precedent at the time of the

13

incident . . . clearly established that public school students enjoy constitution rights against unreasonable searches and seizures by school personnel." *Medina v. Izquierdo*, 594 F. Supp. 3d 1045, 1055–56 (N.D. Ill. 2022). It is also well established that school administrators cannot use excessive force against students. *See Spraggins v. Brown*, No. 16 C 06629, 2019 U.S. Dist. LEXIS 168214, at *15 (N.D. Ill. Sept. 30, 2019) (citing *Doe v. Heck*, 327 F.3d 492, 523 (7th Cir. 2003)). At this time, Mr. Dimke is not entitled to qualified immunity, and Count III may proceed under the Fourth Amendment theories of liability.

II.     Count IV is dismissed without prejudice.

Ms. Moore agrees with the School District Defendants to dismiss Count IV, but asks that the dismissal be without prejudice. *See* Dkt. 49, at 10 n. 4. The Court dismisses Count IV without prejudice.

III.     The failure to intervene claim (Count V) is dismissed without prejudice.

Ms. Moore alleges two different failures to intervene. First, she alleges that Mr. Dimke failed to intervene and prevent SLO Lauer from allegedly violating PM's constitutional rights. Dkt. 29, at ¶ 163. Second, Ms. Moore alleges that Ms. Lee-Black and Ms. Badford failed to intervene and prevent both Mr. Dimke and SLO Lauer from violating PM's constitutional rights. *Id.* at ¶¶ 164–65.

"Omissions as well as actions may violate civil rights." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). An official may be liable for failing to intervene in "an imminent or ongoing constitutional violation." *Sandra T.E. v. Sperlik*, 639 F. Supp. 2d 912, 920 (N.D. Ill. 2009). The official must know of the imminent or ongoing

14

violation. *Id.* Allegations that the official "should have known" are insufficient to state a claim for failure to intervene. *Id.*; *Medina*, 594 F. Supp. 3d at 1060–61. There must also be "a realistic opportunity to intervene to prevent the harm from occurring." *Abdullahi v. Madison*, 423 F.3d 763, 774 (7th Cir. 2005) (internal quotation marks omitted). A "realist opportunity" may exist when there is time to call for backup, help, or, "at least caution[] the excessive force defendant to stop." *Id.* (cleaned up).

The Court starts with the common allegation between Mr. Dimke, Ms. Lee-Black, and Ms. Badford: that they failed to prevent or stop SLO Lauer from depriving PM of his constitutional rights. Dkt. 29, at ¶¶ 163–65. Of course, this claim requires the Court to first evaluate whether Ms. Moore sufficiently alleges that SLO Lauer violated PM's constitutional rights. *See Sandra T.E.*, 639 F. Supp. 2d at 920.

Despite PM not resisting, SLO Lauer, without warning, lifted PM up from behind and "slammed" him into the floor, headfirst, causing serious, life-altering injuries. Dkt. 29, at ¶¶ 68, 73, 75, 102–10. He did so without first requesting information from Mr. Dimke and without observing Mr. Dimke to be in "any physical danger whatsoever." *Id.* at ¶¶ 68–70. Taking the allegations as true, Ms. Moore has sufficiently alleged that SLO Lauer violated PM's constitutional rights under the Fourth Amendment. *See Brown*, 594 F. Supp. 3d at 1033–34.

So, now the question becomes whether Mr. Dimke, Ms. Lee-Black, and Ms. Badford knew of the imminent or ongoing violation of PM's constitutional rights, and, despite having a reasonable opportunity to do so, failed to intervene. *Sandra T.E.*, 639 F. Supp. 2d at 920.

15

Ms. Moore, on one hand, alleges that Mr. Dimke, Ms. Lee-Black, and Ms. Badford all had reasonable opportunities and the ability to prevent or stop SLO Lauer's violation of PM's constitutional rights. Dkt. 29, at ¶¶ 163–65. On the other hand, Ms. Moore alleges that SLO Lauer "immediately and physically took over the situation," and lifted and slammed PM to the floor "without first giving PM any verbal instruction or warning whatsoever." *Id.* at ¶¶ 67, 75. A court need not ignore allegations in the complaint that undermine the plaintiff's claim. *Slaney v. Int'l Amateur Athletic Fed.*, 244 F.3d 580, 597 (7th Cir. 2001). Ms. Moore identifies no opportunity by which Mr. Dimke, Ms. Lee-Black, and Ms. Badford could have learned of[1] and intervened against the forthcoming, out-of-the-blue actions of SLO Lauer. *See* Dkt. 29. Thus, the failure to intervene claim cannot go forward as it relates to SLO Lauer's actions.

Next, the Court addresses Ms. Lee-Black and Ms. Badford's alleged failure to prevent or stop Mr. Dimke from depriving PM of his constitutional rights. The Court has already stated that Mr. Dimke allegedly violated PM's constitutional rights.

What's more, Ms. Lee-Black and Ms. Badford were "close by, observing and overhearing" Mr. Dimke's "interactions and communications with PM," including when Mr. Dimke began applying an escalatory series of physical restraints against PM. *Id.* at ¶¶ 43–66. They were also present when Mr. Dimke attempted to tackle or jump on PM, pushing PM into an office and ending up on top of PM, with PM

---

[1] Ms. Moore's argument that the Mr. Dimke, Ms. Lee-Black, and Ms. Badford should have known that Mr. Lauer was going to do to PM is unavailing. *See Medina*, 594 F. Supp. 3d at 1060–61.

restrained. *Id.* at ¶¶ 61–66. As alleged, Ms. Lee-Black and Ms. Badford had seen the series of escalating physical interactions, and, despite having a reasonable opportunity to stop or prevent Mr. Dimke from allegedly violating PM's constitutional rights, failed to do so. *Id.* Thus, Ms. Moore has stated a claim for failure to intervene against Ms. Lee-Black and Ms. Badford as it relates to Mr. Dimke's conduct. *Sandra T.E.*, 639 F. Supp. 2d at 920.

With respect to the School District Defendants' argument that Ms. Lee-Black and Ms. Badford are entitled to qualified immunity, it is the plaintiff's "burden of showing that the constitutional right allegedly violated was clearly established" before the alleged wrongdoing. *Casteel v. Pieschek*, 3 F.3d 1050, 1053 (7th Cir. 1993); Dkt. 36-1, at 12–13. The plaintiff must "offer either a closely analogous case or evidence that the defendants' conduct is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts." *Casteel*, 3 F.3d at 1053. In this case, Ms. Moore has not identified a "closely analogous case" describing the duty to intervene to prevent a constitutional violation. Ms. Moore also does not advance the argument that the conduct was so patently violative that guidance from the courts was not required.

Accordingly, Count V is dismissed without prejudice.

IV.    The § 1983 *Monell* claim (Count VI) may proceed as alleged.

Ms. Moore brings a § 1983 *Monell* claim against Rockford and the "District/ Board of Education." Dkt. 29, at ¶¶ 168–196. She alleges that "specific, long-standing, interrelated *failures* of official policy and training, *lack* of official policy and training,

17

and *de facto* policies, widespread practices, and/or customs" were the moving force behind SLO Lauer's use of excessive force against PM, and were the "direct causal link" between Rockford's and the Board's "deprivation of PM's rights." *Id.* at ¶ 169.

A § 1983 *Monell* claim, as opposed to a § 1983 claim against an individual, "obviously entails elements" that are "not directly involved" in actions against an individual. *Medina v. Chi.*, 100 F. Supp. 2d 893, 894 (N.D. Ill. 2000). A *Monell* claim "looks more broadly to the customs, policies, or practices that are alleged to contribute to the individual misconduct." *Cadiz v. Kruger*, No. 06 C 5463, 2007 U.S. Dist. LEXIS 88458, at *9 (N.D. Ill. Nov. 29, 2007). The "key" in "applying *Monell*" and avoiding the improper imposition of respondeat superior liability is "distinguish[ing] between the isolated wrongdoing of one or a few rogue employees and other, more widespread practices." *Howell v. Wexford Health Sources., Inc.*, 987 F.3d 647, 654 (7th Cir. 2021). The Court addresses Ms. Moore's theories of liability in turn.

A. The Hiring of Unqualified Officers

Rockford and the Board can be held liable for decisions about hiring if Ms. Moore adequately alleges that they were deliberately indifferent to the "known or obvious consequence[s]" of such hiring decisions. *Bd. of Cnty Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410–411 (1997). Deliberate indifference exists "where adequate scrutiny of the applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right." *Id.* at 398. What's more, to show deliberate indifference, there must be a "strong" connection

18

"between the background of the particular [defendant] and the specific constitutional violation alleged." *Id.* at 412.

According to Ms. Moore, SLO Lauer has a "history of using excessive force against African American citizens, including minors and children." Dkt. 29, at ¶ 172. Before joining the School District, he had been the "subject of multiple complaints of excessive force and other misconduct." *Id.* The Rockford Police and the School District "were aware of all of these facts and other facts about [SLO] Lauer and/or had them available to them when selecting him to be an SLO at Auburn High School but failed to properly review or consider them." *Id.*

In a similar vein, Ms. Moore alleges that Rockford and the Board do not require "SLO training as a job qualification for SLO candidates." *Id.* at ¶ 169. Rockford and the School District "selected, approved, and assigned [officers] to work with students" who were unprepared for their roles as SLO officers and "did not understand their roles and responsibilities vis-à-vis students, including using alternatives to arresting students and using physical force on them." *Id.* at ¶ 176. Training available at the time emphasized the "overarching point" that officers serving in schools should "moderate their usual, street-based understanding and calculus on whether and when to use force and to actively deploy de-escalate [sic] techniques and trauma-informed policing strategies with students." *Id.* at ¶ 180. As a result, the Rockford Police Department the School District "hired officers, including [SLO] Lauer and others, who were not trained, experienced or qualified to work with children and adolescents." *Id.* at ¶ 181.

Both inadequacies in the screening and hiring process allegedly caused the deprivation of PM's constitutional rights. *Id.* at ¶¶ 175, 181.

Ms. Moore has alleged sufficient facts to allow these theories of liability to proceed. Indeed, she alleges that Rockford and the School District knew SLO Lauer had a checkered history with the application of excessive force, and therefore, was "highly likely to inflict the *particular* injury" suffered by PM. *Brown*, 520 U.S. at 412; Dkt. 29, at ¶¶ 172–73. Further, they hired SLO Lauer without requiring school-specific use of force training. *See* Dkt. 29, at ¶ 180. SLO Lauer then went on to allegedly commit another act of excessive force against a student. *See* Dkt. 29, at ¶¶ 67–75. The "strong" connection between Mr. Lauer's background, the failure to require adequate training as a prerequisite to hiring, and the "specific violation alleged" are clear. *Brown*, 520 U.S. at 412. Thus, these theories of liability may proceed.

### B. The Failure to Provide Adequate Training

Ms. Moore also alleges that Rockford and the Board fail to provide "advance or timely SLO training to officers," including training in "de-escalation and trauma-informed policing with youth," before they were assigned to schools in the School District. *Id.* at ¶ 169. According to Ms. Moore, SLOs received training only after they had been on the job for more than six months. *Id.* at ¶ 182.

"[A] municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of persons with whom the untrained employees come into contact. Only then can such a shortcoming be properly thought

20

of as a city policy or custom that is actionable under § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citing *Canton v. Harris*, 489 U.S. 378, 388 (1989)) (cleaned up). "Deliberate indifference" requires "proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* (internal quotations and citation omitted). Only when the municipality is on "actual or constructive notice that a particular omission in the training program causes city employees to violate citizen's constitution rights" can the municipality be deemed deliberately indifferent if the municipality chooses to "retain" the defective program. *Id.*

"A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62 (quoting *Brown*, 520 U.S. at 409).

According to Ms. Moore, the gaps in training "created an environment" in which Rockford police officers "treated student-teacher conflicts and student behavioral issues as violent, criminal situations, thereby causing officers, including [SLO] Lauer here, to respond inappropriately and violate students' constitutional rights." Dkt. 29, at ¶ 185. Rockford and the School District allegedly knew that this inadequate training regime would result in the violation of additional students' constitutional rights, yet, they did not provide adequate training. Dkt. 29, at ¶ 186. If Rockford and the School District "failed to change" the training–or lack thereof– that they provided, despite knowing "constitutional violations were occurring and would likely recur," Rockford and the School District can be said to be deliberately

indifferent to those violations. *See Hall v. Chi.*, 989 F. Supp. 2d 699, 709 (N.D. Ill. 2013). Accordingly, this theory of liability can proceed.

V.    Count VII is dismissed without prejudice.

Ms. Moore agrees with the School District Defendants to dismiss Count VII, but asks that the dismissal be without prejudice. See Dkt. 49, at 19 n. 14. The Court dismisses Count VII without prejudice.

VI.   The retaliatory prosecution claim (Count VIII) can proceed against only SLO Lauer, and the First Amendment retaliation claim (Count X) is dismissed without prejudice.

Plaintiff brings two claims arising from very similar sets of facts. She brings a retaliatory prosecution claim against SLO Lauer, Rockford, and the Board. Dkt. 29, at ¶¶ 211–18. Ms. Moore also brings a First Amendment retaliation claim against the Board, and Ms. Makulec, Dr. Jarrett, and Ms. Hoadley in their official capacities. *Id.* at ¶¶ 225–232.

Ms. Moore has failed to allege facts which bring these claims within the realm of *Monell*. "Failure to allege an official policy or practice of a municipality or local government unit, including a school board, results in dismissal." *S.J. v. Perspectives Charter School*, 685 F. Supp. 2d 847, 856 (N.D. Ill. 2010) (citing *Horwitz v. Bd. of Educ. of Avoca School Dist. No. 37*, 260 F.3d 602, 619–20 (7th Cir. 2001)). So, off the bat, Rockford and the Board are dismissed from Counts VIII and X without prejudice. What's more, a suit against officials in their official capacities is "merely another way of alleging the claim against the entity for which the official is an agent." *Smoler v. Bd. of Educ. for W. Northfield School Dist. #31*, 524 F. Supp. 3d 794, 803 (N.D. Ill.

2021); *see A.J. & R.J. v. Butler Ill. Sch. Dist. 53*, No. 17 C 2849, 2018 U.S. Dist. LEXIS 49121, at *9 (N.D. Ill. Mar. 26, 2018). And although Ms. Moore seeks to change course by arguing that naming them in their official capacity was a scriveners' error, such a substantial change cannot be made in response to a motion to dismiss. *Shanahan v. Chi.*, 82 F.3d 776, 781 (7th Cir. 1996). Accordingly, Ms. Makulec, Dr. Jarrett, and Ms. Hoadley are dismissed from these claims without prejudice. *Smoler*, 524 F. Supp. 3d at 803.

That leaves Ms. Moore's retaliatory prosecution claim against SLO Lauer as the sole survivor. To state a claim for retaliatory prosecution, a plaintiff must allege that: "(1) he participated in an activity protected by the First Amendment; (2) he suffered a harm—that is, the criminal charges—likely to deter future protected activity; and (3) the charges were motivated by retaliation." *Towne v. Donnelly*, 44 F.4th 666, 671 (7th Cir. 2022). The plaintiff must also allege that the charges were brought without probable cause. *Id.*

 Ms. Moore alleges that her "conduct in hiring an attorney, making it known to defendants that [PM] would be filing suit, and in sending demands to defendants to preserve all evidence," was constitutionally protected activity. Dkt. 29, at ¶ 212. Nevertheless, "out of a desire to retaliate against and/or chill/intimidate" her from "taking any further legal action," SLO Lauer, Rockford, and the Board referred PM to the District Attorney's[2] office for juvenile criminal charges, "causing a charge to be

---

[2] Ms. Moore repeatedly refers to the "District Attorney" in both the amended complaint and response brief.  But, in Illinois, there is no "district attorney."  Illinois has "state's attorneys". 55 ILCS § 5/3-9001 *et seq.*

brought." *Id.* at ¶ 213. The charges were brought without probable cause, and the charges were ultimately resolved in PM's favor. *Id.* at ¶ 215.

Ms. Moore's allegations sufficiently plead this claim. And although the School District Defendants take issue as to whether Ms. Moore's activity was, in fact, "constitutionally protected," Ms. Moore's allegation that her activity was constitutionally protected is sufficient. *See Brown v. Chi. Transit Auth. Pension Bd.*, 86 Fed. Appx. 196, 199 (7th Cir. 2004) (citing *Kyle v. Morton High Sch.*, 144 F.3d 448, 454 (7th Cir. 1998)).

VII.    The malicious prosecution claim (Count IX) may proceed under Illinois law as alleged.

Ms. Moore brings a malicious prosecution claim, seemingly under Illinois law,[3] against SLO Lauer, Rockford, and the Board. Dkt. 29, at ¶¶ 219–224. To state a claim for malicious prosecution under Illinois law, the plaintiff must allege: "the commencement or continuance of an original criminal . . . proceeding by the defendant; (2) the termination of that proceeding in favor of the plaintiff; (3) the absence of probable cause for such a proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." *Johnson v. Saville*, 575 F.3d 656, 659 (7th Cir. 2009) (internal quotations and citation omitted). A defendant need not sign a criminal complaint to have commenced or continued a prosecution. *Padilla v. Chi.*, 932 F. Supp. 2d 907, 928 (N.D. Ill. 2013). If the defendant played a "significant role in

---

[3] The heading of Count IX states that Ms. Moore is bringing the claim under Illinois law. Curiously, Ms. Moore later states that she is bringing the claim pursuant to § 1983. Dkt. 29, at ¶ 219. Because there is no § 1983 claim for malicious prosecution in Illinois, the claim can proceed only under Illinois law. *See Llovet v. Chi*, 761 F.3d 759, 762 (7th Cir. 2014).

causing the prosecution," such as by making a false statement to a prosecutor about a suspect, the defendant can be held liable. *Id.* at 928–29. "Malice" is simply acting with "improper motives" *Fabiano v. Palos Hills*, 784 N.E.2d 258, 270 (Ill. App. Ct. 2002). "The absence of any one of these elements bars a plaintiff from pursuing the claim." *Johnson*, 575 F.3d at 659.

Ms. Moore alleges that, "[o]ut of a desire to retaliate against PM for and/or chill him and his family from taking further legal action, [the defendants] decided to refer and did refer PM to the District Attorney's office for juvenile criminal charges, causing a juvenile criminal charge to be brought against him." Dkt. 29, at ¶ 220. The juvenile criminal proceeding, which was initiated without probable cause, ultimately terminated in PM's favor. *Id.* at ¶¶ 221–22. Because of the charges, PM "suffered and will continue to suffer additional serious, long-term, emotional and mental distress and trauma." *Id.* at ¶ 224.

In their motion to dismiss, the School District defendants only argue that the claim is insufficient as alleged against the Board. *See* Dkt. 36-1, at 23–24. They suggest that Ms. Moore failed to adequately allege that the Board "commenced or continued" a criminal judicial proceeding. *Id.* But the complaint makes clear that they are alleged to have referred PM for prosecution. Dkt. 29, at ¶ 220. Although discovery may reveal whether, and to what extent, the Board played a role in commencing or continuing the criminal judicial proceeding, at this stage, Ms. Moore's allegations are sufficient. *See Padilla* 932 F. Supp. 2d at 928.

Accordingly, Count IX may proceed against SLO Lauer, Rockford, and the Board.

VIII.   The respondeat superior claim (Count XI) is dismissed with prejudice, and the indemnification claim (Count XII) can proceed as alleged.

Ms. Moore brings a respondeat superior claim against the Rockford and the Board for the alleged malicious prosecution claimed in Count IX. Dkt. 29, at ¶¶ 233–34. She also brings a claim for indemnification against Rockford and the Board. *Id.* at ¶¶ 236–241.

The respondeat superior claim cannot hold water. There is no cause of action for respondeat superior under Illinois law. *Osundario v. Geragos*, 447 F. Supp. 3d 727, 743 (N.D. Ill. 2020). Respondeat superior is only a theory of liability. *Id.* Thus, Ms. Moore's claim for respondeat superior is dismissed with prejudice.

Turning to the indemnification claim, the School District Defendants' only rationale for dismissing the indemnification claim is that they erroneously believed that the Court would dismiss all of the § 1983 claims and the malicious prosecution claim, leaving nothing "to indemnify under Illinois law." Dkt. 36-1, at 25. The School District Defendants were wrong, and because they have failed to develop other reasons for dismissing the indemnification claim, the indemnification claim lives on. *M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority.").

IX.     The prayer for punitive damages is stricken as it relates to Rockford, the Board, Ms. Makulec, Dr. Jarrett, and Ms. Hoadley.

Punitive damages may not be pursued against Ms. Makulec, Dr. Jarrett, and Ms. Hoadley because they are named in their official capacities. *Graham*, 473 U.S. at 167 n. 13. Punitive damages may not be pursued against the Rockford and the Board, as well. *Newport*, 453 U.S. at 271. And although it is true that the individual defendants cannot turn to public entities to indemnify an award of punitive damages, the School District Defendants identify no authority suggesting that punitive damages are unavailable for the individual defendants who are sued in their individual capacities. 745 ILCS 10/2-102; *Doe 20 v. Bd. of Educ. of Comm. Unit School Dist. No. 5*, 680 F. Supp. 2d 957, 994 (C.D. Ill. 2010). Thus, the prayer for punitive damages can proceed as it relates to SLO Lauer, Mr. Dimke, Ms. Lee-Black, and Ms. Badford.

## CONCLUSION

For the foregoing reasons, and consistent therewith, Count III is dismissed in part with prejudice; Count IV is dismissed without prejudice; Count V is dismissed without prejudice; Count VI may proceed as alleged; Count VII is dismissed without prejudice; Count VIII is dismissed in part without prejudice; Count IX can proceed under Illinois law as alleged; Count X is dismissed without prejudice; Count XI is dismissed with prejudice; Count XII can proceed as alleged; and the prayer for punitive damages is stricken in part.

Ms. Moore has until May 19, 2023, to amend, and if an amended complaint is not filed by that date, the dismissals without prejudice will convert to dismissals with prejudice.

May 2, 2023

_____

Honorable Iain D. Johnston
United States District Judge