## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | |
|---|---|
| Stephene Moore, | |
| Plaintiff, | Case No. 3:22-cv-50354 |
| v. | Honorable Iain D. Johnston |
| Bradley Lauer, et al., | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Stephene Moore brings this case on behalf of her minor son, PM, under 42 U.S.C. § 1983. PM was a fourteen-year-old freshman at Auburn High School, located in Rockford Public School District No. 205 (the "School District"). It is alleged that, following a classroom dispute, school officials violently retrained PM, ultimately throwing him to the floor, causing lifelong physical and mental repercussions.[1] Ms. Moore alleges a plethora of claims against a host of defendants: School Liaison Officer (SLO) Bradley Lauer, the City of Rockford ("Rockford"), Assistant Principal Scott Dimke, Assistant Principal and/or Dean Amber Lee-Black, Hall Monitor/Security Guard Jessica Badford,[2] the Board of Education of Rockford

---

[1] Much of the incident was captured on a video. Those recordings have made their way onto local television, the internet, and the Court file. But no video was submitted as part of the pending motion. The video is disturbing and difficult to watch, which the undersigned has done. But for purposes of this pending motion, the video recording supports—rather than negates—the rulings in this order. Indeed, the video recording is contrary to Plaintiff's counsel's time estimates—and dramatically so. More on this later.

[2] Jessica Basford Palos has been misnamed as "Jessica Badford" but retains the misnomer for the purposes of the motion to dismiss. Dkt. 85 at 1 n.1.

1

Public School District No. 205 (the "Board"), Board President Jude Makulec, District Superintendent Ehren Jarrett, District General Counsel Lori Hoadley, and Welcome Center Relations Director Kristina Reuber. Kitchen sink pleadings rarely lead to a just, speedy, and inexpensive resolution of actions. *See* Fed. R. Civ. P. 1. Instead, they just beget defense filings, attempting to eliminate unnecessary defendants and claims. All the while, the resolution is delayed without any added benefit to the plaintiff's action. When a valid claim exists—as is the case here— larding the complaint with weak and unnecessary claims and defendants distracts from and diminishes the value of the valid claim. *Gurman v. Metro Hous. & Redevelopment Auth.*, 842 F. Supp. 2d 1151, 1154 (D. Minn. 2011) ("The bad obscures the good.").[3] And kitchen sink complaints waste the Court's time. *Suttman-Villars v. Argon Med. Devices, Inc.*, 553 F. Supp. 3d 946, 954 (D.N.M. 2021) (kitchen sink complaints unfairly burden courts).

Before the Court is a motion to dismiss by the Board, Mr. Dimke, Ms. Lee-Black, Ms. Badford, Ms. Makulec, Dr. Jarret, Ms. Hoadley, and Ms. Reuber (collectively, the "School District Defendants"). For the following reasons, the motion is granted.

---

[3] *See also, e.g.*, *Dilution Effect: Focus on Quality, Not Quantity*, Assurance Responsabilité Professionnelle Barreau (Dec. 1, 2021), https://www.assurance-barreau.com/en/articles-maitres-droits/articles/dilution-effect-focus-on-quality-not-quantity; Christopher K. Hsee, *Less Is Better: When Low-Value Options Are Valued More Highly than High-Value Options*, 11 J. Behav. Decision Making 107 (1998).

## I.    Background

At the time of the events in this case, Ms. Moore's son, PM, was in ninth grade at Auburn High School ("Auburn"). Dkt. 75 ¶ 10. He was fourteen years old, approximately 4'11", and 125–130 pounds. *Id.* ¶¶ 10, 31. He is African American. *Id.* ¶ 11. Since kindergarten, PM's school records show that he has exhibited behavioral signs of attention-deficit/hyperactivity disorder (ADHD). *Id.* ¶ 33.

On September 20, 2021, the day before the incident at the heart of this case, during second period, PM's teacher asked him to remove his hoodie. *Id.* ¶ 37. When he refused, the teacher ordered him to leave the class. *Id.* PM left, and the school called his grandmother to pick him up. *Id.*

On September 21, 2021, near the start of second period, the same teacher "began nitpicking at PM, this time harassing him about where in the classroom he could sit." *Id.* ¶ 39. PM left the classroom. *Id.* Shortly after, around 9:05 AM, PM walked past his second period classroom door while walking in the hallway, and the teacher told him that he was supposed to be in class. *Id.* ¶ 40. PM continued walking. *Id.* The teacher "summoned a school official to deal with PM." *Id.*

Enter Mr. Dimke. *Id.* ¶ 41. On prior occasions, Mr. Dimke had "pushed" and "tackled" other students, sometimes grabbing them by their backpacks or hoodies. *Id.* ¶ 134. Allegedly true to form, Mr. Dimke—a large man relative to PM"—"spotted him, approached him, and started a prolonged, escalating, and aggressive interaction with him." *Id.* ¶¶ 41–42. Mr. Dimke stood in front of PM to block his path, and then grabbed onto PM's backpack. *Id.* ¶ 42. "PM did not actively resist." *Id.* ¶ 43.

3

Ms. Badford walked up to PM and Mr. Dimke. *Id.* ¶ 44. She "listened to their conversation, and began talking to PM as well." *Id.* "PM then turned around and walked calmly and slowly in the opposite direction," with both Mr. Dimke and Ms. Badford following calmly. *Id.* ¶ 45. But as PM turned the corner and approached the main school office, Mr. Dimke "again caught up to PM" and "physically blocked his path forward." *Id.* ¶ 48.

Ms. Lee-Black then arrived on the scene in the main school hallway and "observed and overheard" Mr. Dimke's interactions with PM. *Id.* ¶ 49. PM "calmly turned around again" to walk in the opposite direction of Mr. Dimke. *Id.* ¶ 50. Again, Mr. Dimke "physically grabbed hold of PM's back" to "stop and restrain his forward motion." *Id.* ¶ 51. PM did not resist. *Id.* ¶ 52. Mr. Dimke let go, and PM continued walking. *Id.* Mr. Dimke then "physically grabbed PM's arm with one hand and constantly held onto PM as he walked." *Id.* ¶ 53.

They passed by the front of the school office, where Mr. Dimke handed his clipboard to Ms. Lee-Black. *Id.* ¶ 54. She accepted the clipboard, continuing to observe; she "did not say or do anything to [Mr.] Dimke to intervene or suggest[] another course of action by the school." *Id.* ¶ 55.

Things then turned more physical. Mr. Dimke "grabbed PM, wrapped both of his arms around PM's body from behind, and physically carried or dragged PM into the main school office." *Id.* ¶ 56. PM had never been in that office before; to him, it was a "small, secluded room" that was an "isolated space." *Id.* ¶ 57. He grew scared, afraid that Mr. Dimke would hurt him. *Id.*

Mr. Dimke blocked the doorway and tried to talk to PM. *Id.* ¶ 58. When PM tried to leave, Mr. Dimke "moved to block him and physically pushed him back into the office." *Id.* ¶ 59. Around 9:11 AM, Mr. Dimke or Ms. Lee-Black called for one of Auburn's two SLOs to help. *Id.* ¶ 60. SLO Lauer "came to the scene almost immediately." *Id.* ¶ 61. All the while, Mr. Dimke was pushing PM "backwards and deeper" into the main school office. *Id.* ¶ 62. Mr. Dimke then "attempted to tackle or physically jump onto PM's body with the full weight of his body while at the same time pushing him through a closed door inside the office." *Id.* ¶ 64. The attempt resulted in both Mr. Dimke and PM on the floor, with Mr. Dimke on top of PM, and PM "restrained." *Id.* ¶ 65. Though close enough to observe and hear these interactions, neither Ms. Lee-Black nor Ms. Badford "said or did anything at the time to intervene." *Id.* ¶ 67.

SLO Lauer then "entered the office and immediately began [to] physically take over control of the situation" without speaking to anyone. *Id.* ¶ 68. He "did not know what was happening and whether PM posed any danger" to Mr. Dimke, who did not appear to be in danger. *Id.* ¶¶ 69–70. Nevertheless, SLO Lauer jumped into action as Mr. Dimke, Ms. Lee-Black, and Ms. Badford watched from close by. *Id.* ¶¶ 73, 78. SLO Lauer grabbed PM from the floor and held onto his arms from behind, pulling him up and dragging him out of the office. *Id.* During these ten to fifteen seconds, PM did not fight or resist—his body was limp, and he was afraid that SLO Lauer would hurt him. *Id.* ¶ 75. SLO Lauer was at least one foot and seventy pounds larger. *Id.* ¶ 76.

5

Then, without any warning whatsoever, SLO Lauer, who was still behind PM, "locked his arms into PM's arms at the elbows, lifted PM up off of the floor and over his head, and slammed PM down into the hard, tile floor in the main hallway, head-first." *Id.* ¶ 77.

Unable to break the fall, PM's "head and body hit the floor and bore the brunt of the impact." *Id.* ¶ 79. He was knocked unconscious on impact. *Id.* ¶ 81. For several minutes, he lay limp and motionless on the hallway floor. *Id.* SLO Lauer handcuffed PM and searched PM's pockets, revealing nothing noteworthy. *See id.* ¶¶ 83–84. PM felt excruciating pain; the impact resulted in a four-to-six-inch fracture on the left side and top of PM's skull. *Id.* ¶ 79, 82. His wrists also hurt because the handcuffs were too tight. *Id.* ¶ 84.

Paramedics eventually arrived on the scene, and PM was put in a wheelchair. *Id.* ¶ 85. The paramedics wheeled PM toward the school's main entrance, where a stretcher was waiting. *Id.* PM's grandmother entered the school, so they released PM to her. *Id.* ¶ 86. She immediately took PM, who "was visibility trembling and having difficulty walking," to the emergency room. *Id.* ¶ 87.

SLO Lauer allegedly lied to the paramedics, telling them that PM "fell." *Id.* ¶ 90. He and school officials told Ms. Moore that SLO Lauer and PM had been "scuffling" and that PM "slipped," "fell," and "hit his head." *Id.* ¶ 89. Later, school officials told PM's grandmother than PM had been "fighting" with Mr. Dimke and SLO Lauer. *Id.* ¶ 92.

Within one month of the incident, SLO Lauer either resigned his position at Auburn or was involuntarily transferred. *Id.* ¶ 98. However, the Rockford Police Department (RPD) and Rockford neither "conducted an immediate investigation of the incident," nor "opened an internal affairs investigation after the incident." *Id.* ¶ 99. RPD has since decided not to discipline or reprimand SLO Lauer. *Id.* ¶ 100. For over a year, RPD and Rockford officials have declined to publicly comment on the matter, acknowledge the incident, release any records regarding the incident, or hold anyone accountable for SLO Lauer's conduct. *Id.* ¶ 101.

After the incident unfolded, "school officials told PM's family that no further disciplinary action was needed or would be taken with respect to PM." *Id.* ¶ 115. They also stated there would be no juvenile criminal charges pressed. *Id.* ¶ 116. This was reaffirmed a month later at a meeting with school officials. *Id.* ¶ 118. After PM's family retained counsel and asked the Board and RPD to retain evidence, PM's family received a letter from a juvenile probation officer. *Id.* ¶¶ 119–20. The letter summoned PM's family to a meeting and allegedly threatened to PM with prosecution if they did not attend. *Id.* ¶ 120. PM's family never heard from the juvenile probation officer again. *See id.* ¶ 121 n.1.

Ms. Moore alleges that the Board and RPD threatened criminal prosecution "to intimidate and chill them from exercising PM's civil rights by pursuing a lawsuit." *Id.* ¶ 122. Additionally, in retaliation, Ms. Makulec, Dr. Jarrett, Ms. Hoadley, and Ms. Reuber repeatedly refused PM's request to transfer high schools

within the School District—against the advice of outside counsel and despite the "well-known medical risk of re-traumatization." *Id.* ¶¶ 123–24.

SLO Lauer's actions allegedly wreaked havoc on PM's physical and mental health. In addition to the vertical skull fracture, PM suffered a traumatic brain injury. *Id.* ¶¶ 103, 107. He was also injured in "the left side of his back, his chest and ribs, his left arm, the right side of his neck, his right and left legs, and his right ankle." *Id.* ¶ 104. His ribs hurt whenever he breathed or stood up; his jaw hurt so much "that he had to eat soft foods for several weeks." *Id.* He was unable to walk when he returned home from the hospital; "[h]is hands were folded inward," and "he appeared pigeon-toed." *Id.* ¶ 105. For weeks after accruing the injuries, "PM suffered severe headaches, rarely slept, and was frequently throwing up." *Id.* ¶ 106. The traumatic brain injury caused permanent brain damage, exacerbating PM's ADHD, limiting his ability to speak, changing his personality, decreasing his social skills, and reducing his ability to form memories and exercise fine motor control. *Id.* ¶¶ 106–10. He also has many of the symptoms of post-traumatic stress disorder (PTSD). *Id.* ¶ 113. He has become "socially withdrawn" and fears "the outside world," worried that "people are going to hit him." *Id.* ¶ 109. He suffers from involuntary flashbacks and "seems to be in his own mental world," not hearing or responding to the people around him. *Id.* ¶ 112. PM's prognosis is poor, and he "requires high quality, long-term, costly, psychological care and counseling to cope with his injuries." *Id.* ¶¶ 107, 114.

## II.    Legal Standard

Federal Rule of Civil Procedure 8 requires only that a plaintiff's complaint contain a short and plain statement establishing the basis for the claim and the Court's jurisdiction, as well as prayer for the relief sought. Fed. R. Civ. P. 8(a). To survive a motion under Rule 12(b)(6), a plaintiff must allege facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the plaintiff. *United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 839 (7th Cir. 2018). The Court "need not accept as true legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Brooks v. Ross*, 578 F.3d 574, 578 (7th Cir. 2009). The Court may consider documents other than the complaint "when they are referenced in the complaint and central to the plaintiff's claim." *Lax v. Mayorkas*, 20 F.4th 1178, 1181 n.1 (7th Cir. 2021). The moving party bears the burden of establishing the insufficiency of the plaintiff's allegations. *Marcure v. Lynn*, 992 F.3d 625, 631 (7th Cir. 2021).

## III.    Analysis

Ms. Moore's second amended complaint ("SAC") contains thirteen counts,[4] seven[5] of which the School District Defendants move to dismiss.

---

[4] Not including Counts VIII–IX, which Ms. Moore voluntarily dismissed with prejudice. Dkts. 131–32.
[5] Not including Counts XI–XIII, for which the School District Defendants withdrew their objections. Dkt. 112 at 14.

### A. Counts III, VII, XIV

The Court previously dismissed Counts III (to the extent it alleged a due process claim under the Fourteenth Amendment), VII, and XIV. *Moore v. Lauer*, No. 22-cv-50354, 2023 U.S. Dist. LEXIS 76173, at *14, 27, 32 (N.D. Ill. May 2, 2023).[6] Ms. Moore explains that she realleged identical claims in the SAC to preserve them for appeal. Dkt. 102 at 4. This is a peculiarity of Illinois civil practice—based on *Foxcroft Townhome Owners Association v. Hoffman Rosner Corp.*, 449 N.E.2d 125, 126 (Ill. 1983)—which is inapplicable in federal court. *See Ottawa Sav. Bank v. JDI Loans, Inc.*, 871 N.E.2d 236, 241 (Ill. App. Ct. 2007). The Seventh Circuit has held that this pleading is unnecessary; not including previously dismissed claims in an amended complaint does *not* constitute waiver. *Alejo v. Heller*, 328 F.3d 930, 935 (7th Cir. 2003). Ms. Moore will still have the opportunity to challenge prior dismissals upon appeal. *See id.* Counts III (in part), VII and XIV are dismissed with prejudice.

### B. Count IV (Shocks the Conscience/State-Created Danger)

The Court previously dismissed Count IV without prejudice, at the parties' agreement. *Moore*, 2023 U.S. Dist. LEXIS 76173, at *17. The SAC contains an identical Count IV, entitled "Violation of Substantive Constitutional Rights – Conduct That Shocks the Conscience." Dkt. 75 ¶¶ 161–64. Ms. Moore then explains in her response that this is a substantive due process claim premised on a state-

---

[6] The dismissals of Counts III (in part) and XIV (formerly XI) were with prejudice. *Moore*, 2023 U.S. Dist. LEXIS 76173, at *33.

created danger theory of liability, unlike the previous iteration that was premised on an excessive force theory of liability. Dkt. 102 at 4.[7]

The state-created danger doctrine is an exception to the general principle articulated in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), that the Fourteenth Amendment's due process clause does not impose a duty on state actors "to protect individuals from harm by *private actors*." *D.S. v. E. Porter Cnty. Sch. Corp.*, 799 F.3d 793, 798 (7th Cir. 2015) (emphasis added). It's a narrow exception that requires the plaintiff to show (1) that the state created or increased a danger through its affirmative acts, (2) that the failure to protect the plaintiff from danger was a proximate cause of the plaintiff's injury, and (3) that the failure to protect shocks the conscience. *Id.*; *see also Doe v. Village of Arlington Heights*, 782 F.3d 911, 917 (7th Cir. 2015). "Only 'the most egregious official conduct' will satisfy this stringent inquiry." *First Midwest Bank v. City of Chicago*, 988 F.3d 978, 989 (7th Cir. 2021), *cert. denied* 142 S. Ct. 389 (2021) (quoting *Jackson v. Indian Prairie Sch. Dist. 204*, 653 F.3d 647, 654 (7th Cir. 2011)).

But, the School District Defendants argue, if there is no injury caused by *private* actions, the state-created danger exception does not apply. Dkt. 112 at 3. The Seventh Circuit agrees. *See Doxtator v. O'Brien*, 39 F.4th 852, 866–67 (7th Cir.

---

[7] The Court notes that it was not apparent from the SAC that the new Count IV was premised on a different theory of liability, which would seem to run afoul of the rule that a plaintiff cannot add new claims in a response to a motion to dismiss. *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 448 (7th Cir. 2011). But under the Federal Rules of Civil Procedure, plaintiffs are required to plead facts, not legal theories or causes of action. *Shea v. Winnebago Cnty. Sheriff's Dep't*, 746 F. App'x 541, 545 (7th Cir. 2018); *Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 517–18 (7th Cir. 2015).

2022) ("*Deshaney* was limited to private acts of harm. Exceptions to *Deshaney*'s holding thus also apply only to instances involving private acts of harm."). Using Ms. Moore's framing of the situation, Mr. Dimke, by using physical force that required SLO Lauer to be called to the scene, created (or increased) a danger of SLO Lauer hurting PM. Dkt. 102 at 5. SLO Lauer's use of excessive force against PM is not a private harm—he was acting under color of state law, Dkt. 75 ¶ 14—so the state-created danger exception to *Deshaney* cannot apply. *See Doxtator*, 39 F.4th at 867. Count IV is dismissed without prejudice.

### C. Count V (Failure to Intervene)

Next are Ms. Moore's failure to intervene claims. "Omissions as well as actions may violate civil rights." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). An official may be liable for failing to intervene in "an imminent or ongoing constitutional violation." *Sandra T.-E. v. Sperlik*, 639 F. Supp. 2d 912, 920 (N.D. Ill. 2009). The official must know of the imminent or ongoing violation. *Id.* Allegations that the official "should have known" are insufficient to state a claim for failure to intervene. *Id.*; *Medina v. Izquierdo*, 594 F. Supp. 3d 1045, 1060–61 (N.D. Ill. 2022). There must also be "a realistic opportunity to intervene to prevent the harm from occurring." *Abdullahi v. Madison*, 423 F.3d 763, 774 (7th Cir. 2005) (internal quotation marks omitted). A "realistic opportunity" may exist when there is time to call for help or "at least caution[] [the excessive force defendant] to stop." *Id.* (second alteration in original).

The School District Defendants assert qualified immunity under this count. To defeat a defense of qualified immunity, (1) a plaintiff must "adequately allege[]

12

facts that, if true, would constitute a violation of a statutory or constitutional right," and (2) the right must be " 'clearly established' at the time of the alleged violation, such that a reasonable public official would have known his conduct was unlawful." *Hanson v. LeVan*, 967 F.3d 584, 592 (7th Cir. 2020) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A right is "clearly established" when the "contours of the right" are "sufficiently clear" such that a "reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S 635, 640 (1987). Prior case law need not be identical to be "sufficiently clear." *Id.* Rather, the plaintiff must show that, "in light of pre-existing law," a reasonable defendant would have known his actions were unlawful. *Id.*

A Rule 12(b)(6) motion is rarely a "suitable procedural setting" for qualified immunity because it may depend on facts that a plaintiff doesn't need to plead to state a claim. *Hanson*, 967 F.3d at 589; *see Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001). "But when all relevant facts are presented, the court may properly dismiss a case before discovery . . . on the basis of an affirmative defense." *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012). Indeed, in some cases, a district court is duty bound and must grant a Rule 12(b)(6) motion to dismiss based on qualified immunity. *Doe*, 782 F.3d at 916. "[Q]ualified immunity warrants dismissal at the 12(b)(6) stage only when 'the plaintiff asserts the violation of a broad constitutional right that had not been articulated at the time the violation is alleged to have occurred.' " *Hanson*, 967 F.3d at 597 (quoting *Jacobs v. City of Chicago*, 215 F.3d 758, 765 n.3 (7th Cir. 2000)).

Ms. Moore alleges two different failures to intervene: (1) Mr. Dimke, Ms. Lee-Black, and Ms. Badford's failure to stop SLO Lauer and (2) Ms. Lee-Black and Ms. Badford's failure to stop Mr. Dimke.

### 1. Failure to stop SLO Lauer

This claim requires the Court to first evaluate whether Ms. Moore sufficiently alleges that SLO Lauer violated PM's constitutional rights. *See Sandra T.-E.*, 639 F. Supp. 2d at 920. The Court previously found that Ms. Moore had sufficiently alleged that SLO Lauer violated PM's Fourth Amendment rights, *see Moore*, 2023 U.S. Dist. LEXIS 76173, at *18–19, and the School District Defendants don't contest that now. *See* Dkt. 85 at 8–9.

The question remains whether Mr. Dimke, Ms. Lee-Black, and Ms. Badford had a reasonable opportunity to intervene but failed to do so. The Court previously dismissed this claim without prejudice because Ms. Moore identified "no opportunity by which Mr. Dimke, Ms. Lee-Black, and Ms. Badford could have learned of and intervened against the forthcoming, out-of-the-blue actions of SLO Lauer." *Moore*, 2023 U.S. Dist. LEXIS 76173, at *19–20. Ms. Moore explains in her response that the opportunity to intervene was when SLO Lauer spent ten to fifteen seconds dragging and positioning PM before slamming him into the ground. Dkt. 102 at 8.[8] Mr. Dimke was "within inches" of SLO Lauer, and Ms. Lee-Black and Ms.

---

[8] A review of the video recordings shows that the estimate of ten to fifteen seconds is an unreasonable estimate. Three seconds is more like it. But again, this unsupportable allegation only bolsters the decision to grant the motion to dismiss. The Court is perplexed as to why counsel would torch his credibility with this type of allegation—especially when a meritorious claim exists without these misrepresentations.

Badford "were standing at the office doorway two steps" away. Dkt. 75 ¶¶ 73, 78. According to Ms. Moore, this was enough time for the three of them to "at least *say something* to [SLO] Lauer." Dkt. 102 at 8.

However, the ten to fifteen seconds don't fully explain the contradictory allegations that the Court identified last time. Ms. Moore relies on *Lanigan v. Village of East Hazel Crest*, 110 F.3d 467 (7th Cir. 1997), for the proposition that ten to fifteen seconds makes the opportunity to intervene a jury question, but *Lanigan* continues on to qualify that general rule: "unless, considering all of the evidence, a reasonable jury could not possibly conclude otherwise." 110 F.3d at 478. *Lanigan* ultimately concluded that the defendant did not have a "realistic opportunity to intervene" and dismissed the claim. *Id.* (finding that the contact was not "so prolonged that [the defendant] could know or be deliberately indifferent"). In this case, Ms. Moore still alleges that SLO Lauer's actions were out of the blue—he acted "without first giving PM any verbal instruction or warning whatsoever." Dkt. 75 ¶¶ 77. Mr. Dimke, Ms. Lee-Black, and Ms. Badford may have watched SLO Lauer pull PM out of the office for fifteen seconds, *id.* ¶ 78, but that doesn't mean they knew what SLO Lauer was about to do. Perhaps they would have known to intervene in a second attempt to subdue PM with physical force, but like in *Lanigan*, there was only one physical interaction between PM and SLO Lauer.

The SAC also adds an allegation that "[i]t was obvious to [Ms. Lee-Black and Ms. Badford] that [SLO] Lauer's aggressive and escalating use of force with diminutive PM was unnecessary, excessive and patently violative of his rights, such

15

that each knew clearly that she should do or say something to intervene." *Id*. That Ms. Lee-Black and Ms. Badford clearly knew they should intervene is conclusory, and the Court need not accept it as true. *See Brooks*, 578 F.3d at 578. But the standard at this stage is to construe the facts in Ms. Moore's favor, and she has pleaded that Mr. Dimke, Ms. Lee-Black, and Ms. Badford were near SLO Lauer, saw him violating PM's rights, and had enough time to say something to him.[9]

The School District Defendants then argue that Mr. Dimke, Ms. Lee-Black, and Ms. Badford are entitled to qualified immunity because there was no clearly established right that was violated. Dkt. 85 at 9–10. Ms. Moore offers no analogous cases to show a clearly established right, arguing instead that SLO Lauer's actions were so "extreme" that Mr. Dimke, Ms. Lee-Black, and Ms. Badford clearly knew they should say or do something. Dkt. 102 at 9–10.

The Court does not find that it's clearly established that a school official must intervene in a police officer's actions when the officer is potentially using excessive force. It is clearly established that a law enforcement officer must stop other law enforcement officers from infringing upon constitutional rights. *See Yang*, 37 F.3d at 285. But the same cannot be said when the facts involve a law enforcement officer and another public official. *E.g.*, *Wilson v. Burge*, No. 21-cv-03487, 2023 U.S. Dist. LEXIS 56459, at *78 (N.D. Ill. Mar. 31, 2023) (finding that prosecutors and court reporters had no duty to intervene in police officer misconduct). In other districts, courts have also found no violation of a clearly established constitutional

---

[9] The Court finds it implausible that they could have physically intervened, but the opportunity to caution SLO Lauer to stop is sufficient. *See Abdullahi*, 423 F.3d at 774.

right in a school official failing to stop a law enforcement officer. *See, e.g.*, *A.V. v. Douglas Cnty. Sch. Dist. RE-1*, 586 F. Supp. 3d 1053, 1074 (D. Colo. 2022); *Digennaro v. Malgrat*, 522 F. Supp. 3d 1189, 1201–02 (S.D. Fla. 2021); *Tasia R. v. Grossmont Union High Sch. Dist.*, No. 13-cv-2874, 2014 U.S. Dist. LEXIS 103466, at *13 (S.D. Cal. July 28, 2014). This principle of not interfering with law enforcement is also reflected in Illinois state law, which forbids interference with an arrest. *People v. Villareal*, 604 N.E.2d 923, 926 (Ill. 1992).[10] The Court does not find that it would have been clear to Mr. Dimke, Ms. Lee-Black, and Ms. Badford that they needed to intervene to stop SLO Lauer, and so they are entitled to qualified immunity on this claim.

### 2. Failure to stop Mr. Dimke

The Court previously dismissed the second part of this claim without prejudice, finding that Ms. Lee-Black and Ms. Badford were entitled to qualified immunity because Ms. Moore had not identified a "closely analogous case" or argued that the conduct was so "patently violative" that an analogous case was unnecessary. *Moore*, 2023 U.S. Dist. LEXIS 76173, at *21. This time, Ms. Moore attempts to do both.

Ms. Moore provides two cases to show it was clearly established that school officials had a duty to intervene in abuse from another school official. Setting aside that both cases are district court opinions that can't clearly establish a

---

[10] Although Ms. Moore doesn't address this argument, the Court notes that Illinois law may permit resisting an arrest if an officer uses excessive force, *see People v. Williams*, 640 N.E.2d 981, 985 (Ill. App. Ct. 1994), so the application of Illinois law to this situation isn't as clear cut as the School District Defendants contend.

constitutional right, *see Day v. Wooten*, 947 F.3d 453, 462 (7th Cir. 2020), neither case actually shows that. In *Doe v. Board of Education of Chicago*, the court denied the dismissal of the failure to intervene claim because the defendants argued that there was no constitutional violation and it found that the plaintiffs had adequately pleaded one; the court did not address whether the defendant failed to intervene. 611 F. Supp. 3d 516, 538–39 (N.D. Ill. 2020). As for *Sandra T.-E.*, the court found no failure to intervene. 639 F. Supp. 2d at 920. The case involved a teacher sexually abusing some of his female students over the course of many years. *Id.* at 915–18. Although other school officials did nothing to stop the teacher, the court found that the school officials did not know that the teacher would continue abusing his students, and so they couldn't have failed to intervene. *Id.* at 920. That is the opposite outcome of what Ms. Moore is arguing for and cannot establish that Ms. Lee-Black and Ms. Badford should have stopped Mr. Dimke.

On the issue of qualified immunity, *Sandra T.-E.* states that it was clearly established that the principal should have stopped the teacher's abuse but did not opine on any of the other school officials. *Id.* at 927. The clearly established law that applied was the liability on supervisors turning a blind eye to constitutional violations. *Id.* That can't apply to this case because Ms. Lee-Black and Ms. Badford were not Mr. Dimke's supervisors.

Ms. Moore then goes on to argue that a factually identical case isn't necessary to defeat qualified immunity because "the clearly established duty of a school official to intervene when another official is abusing a student applied with obvious

18

clarity." Dkt. 102 at 12. But no party found case law establishing such a duty, nor did the Court.

In the alternative, Ms. Moore argues that no analogous case is needed because the conduct was so egregious. She points to the added allegation in the SAC that "[i]t was obvious to [Ms. Lee-Black and Ms. Badford] that [Mr.] Dimke's escalating use of force with diminutive PM was unnecessary, excessive and patently violative of his rights, such that each knew clearly that she should do or say something to intervene." Dkt. 75 ¶ 67. As with before, that Ms. Lee-Black and Ms. Badford clearly knew they should intervene is conclusory, and the Court need not accept it as true. *See Brooks*, 578 F.3d at 578. As for the first part of that allegation, that Mr. Dimke's conduct was "patently violative" doesn't establish that *Ms. Lee-Black and Ms. Badford* violated PM's rights.[11] The Court is not persuaded that Ms. Lee-Black and Ms. Badford's conduct to be so obvious a constitutional violation that it circumvents the need to show a clearly established right.

Count V is dismissed without prejudice.

### D. Count X (First Amendment Retaliation)

Count X alleges that Ms. Makulec, Dr. Jarrett, Ms. Hoadley, and Ms. Reuber retaliated by denying PM's requests to transfer to another high school after PM's family hired an attorney, informed them that PM would be filing a lawsuit, and had the attorney send written demands to them. Dkt. 75 ¶¶ 229–32. The School District

---

[11] Ms. Moore's argument opposing the previous motion to dismiss had the same logical flaw, Dkt. 49 at 10, and this Court found that Ms. Moore had not shown that Ms. Lee-Black and Ms. Badford violated a clearly established right. *See Moore*, 2023 U.S. Dist. LEXIS 76173, at *21.

Defendants oppose this claim on qualified immunity grounds, arguing that there is no clearly established right to hire an attorney and write letters regarding a potential civil lawsuit. *See* Dkt. 85 at 16–18.

As stated earlier, to overcome qualified immunity, the plaintiff must "first allege the deprivation of an actual constitutional right, and second, show that the right was clearly established at the time of the alleged violation." *Alvarado*, 267 F.3d at 652. At the Rule 12(b)(6) stage, qualified immunity is warranted "only when 'the plaintiff asserts the violation of a broad constitutional right that had not been articulated at the time the violation is alleged to have occurred.'" *Hanson*, 967 F.3d at 597 (quoting *Jacobs*, 215 F.3d at 765 n.3).

Assuming, as the School District Defendants have, that Ms. Moore has sufficiently pleaded a First Amendment retaliation claim, the Court addresses only whether Ms. Makulec, Dr. Jarrett, Ms. Hoadley, and Ms. Reuber violated a clearly established right. Taking the SAC's pleaded allegations as true, these defendants failed to transfer PM because of the threatened lawsuit. Dkt. 75 ¶¶ 122–23. The question becomes whether a reasonable public official would have known that denying those requests in retaliation violated PM's First Amendment rights. *See Hanson*, 967 F.3d at 596. In essence, was it clearly established that hiring an attorney and sending written demands to preserve evidence would be protected under the First Amendment?

 Ms. Moore cites some cases in support of the proposition that the First Amendment generally bars retaliation for protected speech, but the School District

Defendants correctly point out factual differences. *Crawford-El v. Britton* concerned a correctional officer allegedly misdirecting packages to punish the incarcerated recipient's exercise of his First Amendment rights. 523 U.S. 574, 578–79, 592 (1998). *Mt. Healthy City School District Board of Education v. Doyle* was about a school board deciding not to rehire a teacher who criticized the school's new employee dress code to a local radio station. 429 U.S. 274, 282 (1977). Neither case involves school administrators retaliating against a student.

Ms. Moore gets closer with *C.B. v. Board of Education of Chicago, District 299*, 624 F. Supp. 3d 898 (N.D. Ill. 2022), although, again, it is a district court opinion that can't clearly establish a constitutional right for qualified immunity purposes. *Mason-Funk v. City of Neenah*, 895 F.3d 504, 509 (7th Cir. 2018). In that case, a school retaliated against a student who complained about racial discrimination by unenrolling the student and refusing to comply with the Individuals with Disabilities in Education Act (IDEA). *See id.* at 914. The court was persuaded that qualified immunity did not apply because the plaintiffs provided cases that involved similar procedural violations of the IDEA. *Id.* at 917. However, complaining to a school about racial discrimination is different from asking a school to preserve evidence for a possible lawsuit. In addition, *C.B.* was likely decided *after* the events pertinent to this retaliation claim,[12] so it may not show that clearly established law "at the time of the alleged violation." *Hanson*, 967 F.3d at 592.

---

[12] *C.B.* was decided on August 26, 2022. The SAC does not say when PM's request to transfer to another school was denied, but based on dates in the surrounding allegations, it seems likely that this would have happened in late 2021 or early 2022. *See* Dkt. 75 ¶¶ 119–21.

The Court was also unable to find any case law to support a clearly established right to threaten litigation. To the contrary, the Seventh Circuit has held that the First Amendment does not protect "a *threat* to file a grievance," *Bridges v. Gilbert*, 557 F.3d 541, 555 (7th Cir. 2009), and it has not ruled on whether this extends to lawsuits, *Reed v. Bowen*, 769 F. App'x 365, 370 (7th Cir. 2019) ("We have not ruled that threatening to file a lawsuit is protected activity."). Based on *Bridges*, some courts have found no First Amendment protection for threatening to file a lawsuit. *E.g.*, *Long v. Pock*, No. 17-cv-1020, 2018 U.S. Dist. LEXIS 5855 at *4-5 (E.D. Wis. Jan. 12, 2018). Other courts have found First Amendment protection by recharacterizing the retaliatory act as a prior restraint, following the Seventh Circuit's guidance in *Fairley v. Andrews*, 578 F.3d 518 (7th Cir. 2009). *E.g.*, *Parnell v. Lashbrook*, No. 16-cv-1144, 2017 U.S. Dist. LEXIS 104400, at *19–22 (S.D. Ill. July 6, 2017); *Braboy v. Ill. Dep't of Corr.*, No. 17-cv-922, 2017 U.S. Dist. LEXIS 160021, at *25–29 (S.D. Ill. Sept. 28, 2017). The retaliation at issue in *Fairley* was correctional officers assaulting individuals to prevent them from testifying; it did not overturn *Bridges*' statement that a threat of a grievance was not protected. *See Fairley*, 578 F.3d at 525.

The Court finds that it would not have been clear that punishing PM for notifying the defendants of a potential lawsuit would violate PM's First Amendment rights, and so Ms. Makulec, Dr. Jarrett, Ms. Hoadley, and Ms. Reuber are entitled to qualified immunity. Count X is dismissed with prejudice.

### E. Count XV (Indemnification)

The School District Defendants ask that the indemnification claim be dismissed in part for a few reasons. First, to the extent that it seeks to indemnify punitive damages, Ms. Moore has agreed to dismiss the claim in part. Dkt. 102 at 23. The prayer for punitive damages is stricken as it relates to those public entities.

Second, the School District Defendants also ask that the indemnification claim be dismissed to the extent any of the state law claims are dismissed, Dkt. 85 at 20; Count XV is dismissed in part as it relates to Count IX (which has since been voluntarily dismissed by Ms. Moore). In addition, with no remaining counts against Ms. Lee-Black, Ms. Badford, Ms. Makulec, Dr. Jarrett, Ms. Hoadley, and Ms. Reuber; Count XV is dismissed in part as it relates to those defendants.

The Court declines to address the School District Defendants' request that Count XV be dismissed to the extent that it seeks to indemnify the § 1983 claims because the School District Defendants waited until their reply brief to make this argument. *See O'Neal v. Reilly*, 961 F.3d 973, 974 (7th Cir. 2020).[13]

## IV. Conclusion

Count III is dismissed in part with prejudice. Counts IV, and V are dismissed without prejudice. Counts VII, X, and XIV are dismissed with prejudice. Count XV

---

[13] Regardless, the School District Defendants' argument that § 1983 claims cannot be indemnified because there is no *respondeat superior* liability is unavailing. *See, e.g.*, *Turner v. City of Chicago*, No. 12 C 9994, 2013 U.S. Dist. LEXIS 113122, at *21 (N.D. Ill. Aug. 12, 2013) ("This argument improperly conflates indemnification with a substantive claim . . . based on vicarious liability."); *see also, e.g.*, *Clark v. Cook Cnty. Sheriff's Off.*, Nos. 19 C 7131, 21 C 3093, 2023 U.S. Dist. LEXIS 108076, at *23 (N.D. Ill. June 20, 2023); *Sebastian v. City of Chicago*, No. 05 C 2077, 2008 U.S. Dist. LEXIS 60570, at *136–37 (N.D. Ill. July 24, 2008).

is dismissed in part without prejudice. The prayer for punitive damages is stricken in part. Ms. Lee-Black, Ms. Badford, Ms. Makulec, Dr. Jarrett, Ms. Hoadley, and Ms. Reuber are terminated from the case.

Ms. Moore has until February 19, 2024, to amend, and if an amended complaint is not filed by that date, the dismissals without prejudice will convert to dismissals with prejudice. The Court strongly counsels against another amended pleading for the reasons stated throughout this order.

Before the parties spend more time and money on this litigation, they should give serious thought to immediately resolving it by way of a settlement conference or mediation. The sooner this action is resolved, the sooner healing—by PM, his mother, his grandmother, and the community at large—can begin.

Date: January 23, 2024

Honorable Iain D. Johnston
United States District Judge